**The People of the State of Illinois, Defendant in Error, v. Dave Barry and Abraham Karatz, Plaintiffs in Error.**

**Gen. No. 38,645.**

14

Opinion filed June 22, 1936.   Rehearing denied July 6, 1936.

Myer H. Gladstone, J. J. Buckley and Thomas Joyce, all of Chicago, for plaintiffs in error.

Thomas J. Courtney, State's Attorney, for defendant in error; Edward E. Wilson, John T. Gallagher and Richard H. Devine, Assistant State's Attorneys, of counsel.

Mr. Justice Denis E. Sullivan delivered the opinion of the court.

This case comes to us on a writ of error to review a judgment of conviction against the two defendants, Dave Barry and Abraham Karatz.

On December 12, 1934, the grand jury of Cook county returned an indictment against Dave Barry, Abraham Karatz, Otto Van Derck, Walter Ehlers, Joseph Baiata, alias Charles Carloni, alias J. B. Farquhar, alias Joseph B. Marsino, alias Joseph Marcino, alias Joseph Omar, alias Joseph Omer, alias Harry Goldman, alias Frank Bianco, one Gustaf Linquist, and one Hayden Sanders, charging them with the crime of conspiracy to defraud the Amalgamated Trust & Savings Bank, a corporation, out of a large sum of money, to wit, $55,000.

The indictment consisted of 11 counts, one of which, Count 8, was dismissed on motion of the People. To the indictment Joseph Baiata pleaded guilty and was sentenced to the penitentiary. Dave Barry and Abraham Karatz, after motions to quash the indictments were overruled, pleaded not guilty and on June 17, 1935, went to trial before a court and jury. The other defendants were granted separate trials.

The defendants Barry and Karatz were found guilty, Barry being sentenced to one year in the county jail and Karatz was sentenced to serve from one to five years in the penitentiary and to pay a fine of $2,000. There is no assignment of errors as to the indictment or its various counts, nor as to the instructions given by the court.

The evidence in this record tends to show that Barry, a man 48 years of age, lived in Chicago and was well known as a boxing manager and later as a referee; that he had considerable publicity as a leader in athletic sports and at one time operated a gymnasium business which failed in 1931, due largely to the failure of the City State Bank of this city.

The evidence further shows that in January, 1934, at the telephone request of a friend, Barry went to 112 West Madison street where he was introduced to Joe Baiata who was operating a restaurant at that address known as ''The Pub Bar and Restaurant,'' which in turn was owned by 112 W. Madison Grill, Inc., of which corporation Joe Baiata was president and A. H. Karatz, one of the defendants here, was secretary; that as a result of this conference an agreement was made on January 22, 1934, by and between 112 West Madison Grill, Inc., and Dave Barry, by the terms of which Barry was engaged as general manager of its bar and restaurant for the period of 60 days at $50 per week; that Barry agreed to give his entire time and attention to the interests of said first party; that Barry's name was to be applied to the business at the aforesaid location; that it was further agreed by and betwen the parties as set forth in their written agreement that during the 60-day period mentioned in the agreement it would be ascertained whether or not Barry could increase the restaurant business of the party of the first part in a fairly substantial manner and, if successful, they would enter into another agreement relative to the restaurant business.

The evidence further shows that, pursuant to the aforesaid agreement, the words "Dave Barry, Inc." were placed upon the window of the restaurant and at the end of the 60 days the business had increased to such an extent that Baiata, the owner, suggested that they enter into an arrangement, which they did, whereby they would reincorporate and Barry would receive 33 1/3 per cent of the stock in the new corporation, 10 per cent of which was to be issued to him at the end of the first year, 10 per cent at the end of the second year and 13 1/3 per cent at the end of the third year. The new corporation made a contract with Barry as manager of the restaurant, with a sliding scale in addition to his salary, based on a minimum of $200 a day receipts. His duties were that of a creator of goodwill—greeting people who patronized the restaurant and bar.

The evidence further shows that Barry was not paid very promptly and was about to quit when Baiata induced him to remain; that Barry was told his salary would be paid more promptly; that shortly after the new corporation, known as the Dave Barry, Inc. of which Dave Barry was president, Theodore H. Freter, Jr., secretary, and Frank Bianco, treasurer, was operating, Baiata told Barry he had opened an account with the Amalgamated Bank under the name of the new corporation; that, as president, Barry would have to be one of the signers of the checks and Baiata asked him to sign a signature card for the bank, which Barry did; that Barry never made any deposits or called at the bank and did not receive any of the statements from the bank as the deposits and care of the account was handled exclusively by Baiata.

The evidence further shows that soon after the bank account was opened, Barry was requested by Baiata to be at the restaurant earlier, his usual time to arrive at the tavern being 12:00 and 12:30 o'clock at noon each day; that Barry replied that he was already putting in

from 12 to 13 hours a day and that it would be impossible for him to get there earlier as he stayed there so late at night; that thereupon Baiata suggested that the deliveries of the supplies for the restaurant were made in the morning and as they were paid for by check, the men making the deliveries had to come back in the afternoon to get their checks and suggested that Barry, upon leaving at night, sign five or six checks in blank, as he stated, ''to care for these fellows as they come in the next day''; that he signed checks as Baiata requested almost every night.

Prior to June 15, 1934, defendant Barry promoted and conducted a trip to the Carnera-Baer fight in New York which was run in his name.

It is charged by the State that the plan by which the conspiracy to rob The Amalgamated Trust and Savings Bank was enacted, involved one Otto Van Derck, who was employed as a clerk in the Amalgamated Trust & Savings Bank, where the account of Dave Barry, Inc. was kept; that Van Derck was to draw out certain of the checks issued by the corporation, Dave Barry, Inc. and not charge them against the bank account of Dave Barry, Inc. and either destroy them or return them to Baiata, so that, regardless of the amount of money that was paid out on said checks, they were not charged against the bank account of Dave Barry, Inc. and in that way the money was abstracted from the bank.

Otto Van Derck, one of the defendants, testified for the State substantially as follows:

In March, 1934, he was employed as a bank clerk in the Amalgamated Bank and had worked there since June, 1933; that prior to that time he had been out of work for two and a half months and previous to that time he had worked for the City National Bank; that his salary at the Amalgamated Bank was $65 per month; that he had charge of checks that came in on customer's accounts.

Van Derck further testified that on April 4th, he returned two checks on the Dave Barry, Inc. account for insufficient funds; that he went to Dave Barry, Inc., at 112 West Madison street and met a man at the door, later identified as Joseph Baiata, and asked him if he was Dave Barry and that the man said he was not but that he was the manager; that he asked Van Derck what he wanted to see Barry about and Van Derck told him he was a bookkeeper at the Amalgamated Bank; that he had returned two checks for insufficient funds that day but that he had the names of the indorsers and that they could get in touch with the indorsers and thereby relieve some of the embarrassment of having the checks returned; that the man he was talking with was Baiata; that he asked Van Derck to have a glass of beer, which he took, and they sat at the bar together; that Baiata asked him if there was any way he could find out what the total of the checks was that came through the clearings every day; that Van Derck told Baiata he could call him between 10:30 and 11:00 o'clock in the morning; that he had about a half dozen customers who called him to find out what their total clearings were.

Van Derck further testified that the next evening Baiata introduced him to Barry as ''Van'' and it was explained to Barry that he was going to let them know what their balance was every day and that Barry said, ''That is fine, Van; we sure appreciate service like that. We haven't a good account now, but we will have as soon as business picks up.''

Van Derck further testified that a couple of days later he stopped in the restaurant and saw Baiata and Barry at the bar and Baiata said, ''Any time you want to have your supper here, or your lunch, you are welcome to stay''; that he, Van Derck, thereupon ordered his supper and Baiata sat down with him at the table and pulled out a package of typewritten sheets which

he said was a commercial report on himself; that Baiata said that at one time he was vice president of the Atlas Exchange Bank in Chicago and at another time he controlled several insurance companies; that a brewery was going to furnish part of the capital for the tavern and they expected a check from the brewery in a day or two; that Baiata said he had held a lot of responsible positions in his time and that he would be on top again; that Baiata further said as they sat at the table while he, Van-Derck, was eating his dinner that when he, Baiata, had been vice president of the Atlas Exchange Bank in Chicago that an auditor in a loop bank had taken care of an $8,000 check for him for a month, and he said he had rewarded him well for it; that Baiata said, "Now, Van, we had to issue a couple of checks today. One is for $90 and one is for $82. I wonder if you could pull those out of work for a few days. As soon as we get this check from the brewery company we can put it back in and nobody will know whatever"; that Van Derck said, "If you will get that check in a couple of days, I will take those two out of work for you."

Van Derck further testifying explained that by pulling checks out of work, he prevented their being charged against any account or being returned "NSF"; that the next day the two checks, one for $90 and one for $82, "showed up" and he took them "out of work" and put them in his back pocket; that both checks were payable to J. V. Farquhar, cashed at the Brevoort Hotel, and came through the First National Bank of Chicago; that he "pulled" those checks on April 9th, and at noon that day he went to the tavern and met Joe Baiata and he told Baiata that he had those checks and Baiata told him that he would have to hold them for a couple of days and that when they received the check from the brewery Van Derck could put them back in work again; that the next day he saw

Baiata and asked him if he had heard from the brewery; that Baiata said that he had not; that Karatz was a lawyer and was handling the matter for them; that Karatz had been pointed out to Van Derck and he knew who he was; that he held out the two checks aggregating $172 at the request of Baiata.

Van Derck further testified that the next day he called at the tavern and Baiata told him that the officer of the brewery who had to O. K. the check was called out of town to some place in Wisconsin where his wife was sick; that Baiata also said that he had to issue a couple of checks for liquor and that he would like to have Van Derck pull those because they needed help "right now."

Van Derck further testified that he had the two checks amounting to $172 that he had taken out the day before and that in the latter part of July he gave them to Baiata; that he had about 50 checks in his pocket at one time and that he put them in an old shoe he had at home; that later he gave the checks to Baiata and had not seen them since; that on April 13th or 14th he, Van Derck, went to the tavern at noon where he met Dave Barry and asked him if he had heard from the brewery about that check and that Barry said that Joe and Karatz were over there and that maybe they would bring it back with them that afternoon; that he went back to the tavern that night and saw Joe and Dave; that Baiata said the officer who was to sign the check hadn't got into town yet and that Van Derck asked him to wire the officer to O. K. the check but that Baiata said he did not want to bother him while his wife was so deathly sick and that he would probably come back to Chicago when she was over the crisis.

Van Derck further testified that on May 14th he sat in a booth in the tavern and Baiata and Barry came over and he started to cry; that Joe said, "What's

the matter Van?'' and that Van Derck said, ''It is all over now the bank examiners came in today—now they will find out about this and I will probably have to go to jail''; that Baiata asked what the bank examiners did and that Van Derck told him that he thought they ''ran a straight list,'' but that he was not sure; that his shortage at that time was $1,155, which covered all the checks he had pulled; that he had pulled some other checks since the first two groups; that he had a conversation about the checks he pulled to bring the amount up to $1,155 with *either* Joe or Dave, but that he could not give the date. (This statement was contradicted later by him on cross-examination (Abst. p. 86) when Van Derck said: ''I never talked to Barry about his relations to Baiata. Baiata arranged for most of the withdrawals. Barry was not in the conversations when I was told to pull a check.'')

Van Derck further testified, when talking about running the ''fight special'' to New York, that he had a conversation with Barry and Baiata, in which Baiata said in the presence of Barry that they would have to pull a check and that he, Van Derck, consented to pull two checks for Baiata to cash at the Brevoort Hotel; that after the trip to New York, Van Derck stated he had a conversation with Baiata in which he consented to pull another check for $500; that he saw Joe and Dave at the restaurant every day and that the conversations were almost exclusively with Baiata; that he saw Karatz in the tavern three or four days a week, but that he would only nod to him; that he never had a conversation with him; that he, Van Derck, did not know what Karatz had to do with the Hall of Champions at the Fair, which was the enterprise which was being conducted by Barry at A Century of Progress or World's Fair.

Van Derck further testified that one day Baiata told him that they were forming a new corporation and

were calling it the Dave Barry Amusement Corporation; that after the exhibition opened at the Fair he did not see Karatz or Barry but that he saw Baiata three or four times a week at Baiata's room at the Brevoort Hotel and Baiata would always say to him that "Dave and Karatz are out at the Fair"; that one night about the middle of August he had a conversation with Baiata and Karatz at the Fair grounds and that Baiata said, "Karatz, I have been telling Van about the security deal that is on the fire in Indianapolis. Now you know all about it. I want you to tell him what a good thing it is. I have been telling him all about it. Now, I want you to tell him. I want him to know that when you go down there you are going to really do something." Van Derck stated he said, "Is this a sure thing, Karatz? Are these people ready to turn over the securities?" and that Karatz said, "Sure. Give me that expense money and I will go down there and see them." That he, Van Derck, said, "I don't like to pull any checks for expense money for you to go anywhere unless you are going to put over a deal that is going to go over this time." Karatz replied, "Don't worry; it is a sure thing." Van Derck testified that Baiata then said, "Well, Van, I told Karatz what a hole we are in and he said he is going to do all he can to help us out of it now. He has got a good thing and he is going to help us." Van Derck testified he then said, "You know it is $18,000 that has been taken out now." Karatz said, "Never mind that. You can get that expense money and I will put this deal over."

Van Derck testified further that he had a talk with Dave Barry only once after that; that he saw Barry at the Fair grounds and that Barry had opened an account at the Terminal National under the name of the "Dave Barry Enterprises"; that he said to Barry that now that the check from the Fair was beginning

to get a little bit bigger every week, you open this account at the Terminal National and start putting checks from the Fair there; that Barry told him that that was a separate enterprise but that when they got surplus funds in the Terminal they would transfer them to the Amalgamated.

Van Derck further testified that about September he saw Baiata and that Baiata said that Karatz and he were going to buy an insurance company; that Baiata said they were going to give a down payment and elect their officers and ''after our officers are in there we will be able to juggle the securities and put in 'hot' securities and sell the good ones, and in that way we will get money to put back in the Amalgamated Bank''; that he asked Baiata where they were going to get the money to buy the insurance company and Van Derck told Baiata he was not going to get any money for him; that Baiata (evidently referring to athletic exhibitions) said, ''Listen Van, we have always been in the kind of business that Dave Barry has known about. Now we are going to get in a business that Karatz and I know, and we will make this thing go''; that no one was present at this conversation, other than Baiata, and that Baiata told him that if he would pull this $10,000, it would be the last he would ever have to pull; that he, Van Derck, consented to pull the $10,000 check for Baiata and they figured out how they would put the checks through; that Baiata deposited checks on different banks, but no item was a thousand dollars or over, they were usually for $900; that these checks came through around the 7th, 8th and 9th of September.

Van Derck further testified that on or about September 6th or 7th, one of the first days Baiata deposited the checks, he had a conversation with Baiata and Karatz in the tavern and that he told them they would have to get Art Fortier, who was the head bookkeeper,

out of the bank the next morning and that if he was not there he, Van Derck, could pull the checks before anybody else would see them; that Baiata said he would call Fortier up and have him come over to the Atlantic Tavern and would talk to him about getting him a job with the insurance company; that the next morning Fortier went out of the bank and during that time Van Derck pulled two or three checks for $900 apiece.

Van Derck further testifying stated that on the two succeeding days he pulled checks, one for $923 and one for $907, the rest were for $900 even; that he again saw Fortier leave the bank on October 3rd and he pulled two checks, one for $3,000 and one for $4,150, both drawn on the Amalgamated Bank and on October 4th he pulled two checks for $4,075 each, both of which came from the Terminal National Bank; that around September 15th, he had a talk with Baiata with reference to the insurance company at 123 West Madison street, at the office of Dave Barry Enterprises, Inc., which operated the Garden of Champions, which was the same corporation whose bank account was with the Terminal National; that Baiata said they were not going to get the Franklin Life Insurance but were going to get a smaller company, the Abraham Lincoln Life Insurance Company at Springfield; that Baiata told him they had paid $10,000 as a down payment; that a Mr. Linquist from Minnesota was going with him and Karatz to Springfield to help turn the deal; that he showed Van Derck what was purported to be a contract and after reading it Van Derck said to him, "Now it says in the contract you have to put down another $15,000 before you can put in your own president and treasurer . . . you said I would not have to pull any more. Where are you going to get the money to get that fifteen thousand?" Van Derck continuing stated that Baiata said that he would have to pull it because if he did not they would lose the

$10,000 and that it was the only thing they could do; that Van Derck said, "All right, I will pull them"; that Baiata said he would make the checks out for $4,050 or $4,100 and that he would write in the left hand corner "Dividend No. 3," so that if anyone saw them "they would not wonder what the checks were for."

Van Derck further testifying said that on October 1st, or 2nd, he talked with Baiata and Karatz in the tavern; that he told them they would have to get Art Fortier out of the bank the next morning as they could not afford to have him see the checks because if he did, that he, Van Derck, would have to return them; that Karatz said that he would talk to him about his job down at the insurance company; that he talked with Karatz and Baiata in the latter part of October or the first week of November in the One LaSalle Building; that Baiata stated that he had given Hill, the president of the insurance company, a check for $900 and that when it came through he wanted Van Derck to save it as he wanted it as a receipt as Hill needed some money and that by their letting him take the $900 Hill would let Karatz, Linquist and a Mr. Sanders have full access to the investment portfolio and that they would be able to take some bonds out and sell them; that Baiata said, "You will have to take it. We don't want that check to bounce on him"; that he, Van Derck, said, "All right, if it is like that, I will pull it."

At these times objections were made to the conversations outside the presence of Barry. The court admitted the conversations, subject to objections, to be connected up later. Thereafter People's exhibits, photostatic copies of the bank's accounts, were introduced in evidence showing the amount of the shortage as $54,473.28.

Van Derck testified further that the next conversation he had was on Friday, November 16, in the One North LaSalle Building and that Baiata, Sanders and

Ehlers were present; that a plan was made to have the draft for $25,000 redeposited in the Abraham Lincoln Life Insurance Company's account; that Van Derck was to pull $25,000 worth of checks and that they would need about $1,000 for expenses; that Sanders telephoned St. Paul and talked with Karatz in which conversation Linquist's name was mentioned; that on the Sunday following, Van Derck talked with Karatz over the 'phone; that Karatz was at the Hotel LaSalle.

Van Derck further testified that he got for himself between $200 and $300 from Baiata and that he did not pay for any drinks or meals at the tavern; that he got a suit of clothes; that he occasionally got a dollar or two from Joe, sometimes five dollars and he occasionally got ten dollars.

Van Derck identified Karatz sitting in the courtroom.

On cross-examination Van Derck said that Mr. Baiata introduced him to Barry at the restaurant; that he did not tell him anything about Barry; that Baiata said to Barry, "This is Van; I want you to take care of him; anything he wants, give him here." Continuing he stated that he could not tell whether or not the face of the checks were in Barry's handwriting as he did not pay any attention to them; that all he looked for was the signature, the amount of the check and the date; that he pulled the first two checks on April 9th, and that Baiata never redeemed a check for him.

Van Derck further testified that when he went to the Fair he "bawled" Barry out for opening an account in the Terminal Bank; that Barry did not have an individual account at the Amalgamated Bank or the Terminal Bank; that he did not recall ever seeing Barry come to the bank with the tavern receipts; that he went out to the Fair and saw Barry working; that he knew Barry was getting prize fighters; that he knew that was in line with Barry's work; that Barry made

the announcements for the ring; that he did not know how much Barry was getting; that he never talked with Barry about his relations with Baiata; that Barry was not present in the conversations when he was told to pull a check.

On cross-examination Van Derck further stated that the first party he talked to about pulling a check was Baiata; that during all this time he saw Karatz in the tavern three or four days a week, until he went to the Fair grounds; that he had stated the defalcation was $30,000 at the former trial, but that he had made a mistake because in the middle of September it was $30,000; that he had forgotten a lot of the conversations; that it was not part of his duty to go to the tavern with reference to small checks being overdrawn; that he did not have to nor had he been told to do so by any superior officer.

Van Derck further testified on cross-examination that Baiata, Karatz and himself were present at a conversation which took place in the tavern about the first part of September in which conversation he told them they would have to get Art Fortier out of the bank so that he could pull the check; that up to September 5th, or 6th, 1934, he had pulled about 130 or 135 checks, totaling about $18,000 or $19,000; that the amount was $18,000 about August 15th, and about $30,000 September 15th; that Dave Barry never gave him anything in actual cash nor a suit or clothes; that Baiata bought the suit for him; that he got free hair cuts and drinks and that these were given to him by either Dave or Joe.

Arthur Fortier, a witness for the State, testified that he was 23 years old and was employed as head bookkeeper for the Amalgamated Bank on May 1st; that he had been called from the bank one morning, on October 1st, and talked with Baiata about getting a job with the Abraham Lincoln Life Insurance Company; that about October 4th, he received a telephone

call about 9 :15 or 9 :20 in the morning from Mr. Karatz; that Mr. Karatz said he wanted to see him in the lobby of the Atlantic Hotel; that Karatz talked to him about getting the job with the insurance company; that he took his history, such as his name, address, the school he attended, his education and his father's name.

Fortier testified on cross-examination that he worked at the Hall of Champions at the Fair; that Baiata paid his salary and that Barry was there refereeing the bouts.

Philip Baiata, a witness called on behalf of the People, testified, among other things, that he was a brother of Joseph Baiata; that he had a barber shop and that Joe Baiata told him that any time Van Derck came in to take care of him and that his credit was good; that he did take care of him; that Barry put on the shows at the Fair and that Joe Baiata would tell him to get a check book out of the drawer and give it to Dave Barry; that Barry would sign from 8 to 15 checks in blank; that he would then put the checks back in the drawer and that they would be for the next day's business; that Joseph Baiata would handle the checks for the next day's business and countersign them and he would make out the checks the way he wanted them; that Barry only signed his name on these checks; that this happened every night; that he would come in at midnight and sign the checks; there were standing orders on it; that Frank Bianco knew that Joseph Baiata was using his name; that Frank Bianco was sick at the time they opened the account at the Amalgamated Bank; that he was told by his brother Joe Baiata to take care of Van Derck and he did as he was told.

Frank Bianco, a witness called by the State, testified that he is a nephew of Joseph Baiata and that he worked at the tavern as a bartender; that he gave his uncle permission to use his name as an alias and to

sign his name to the signature card at the bank; that on one occasion he heard Baiata say something to Barry about some checks, two being for $5,000 apiece and two for $8,000 apiece; that the checks were to be used to purchase a bank in Indianapolis and that the writing on the checks for $8,000 each was in Barry's handwriting.

Frank Bianco further testifying stated that he made out the deposit tickets and that he went to the bank and deposited the two checks for $5,000 each on Saturday, November 17th, and the two checks for $8,000 each on Monday, the 19th, at the request of his uncle, all of which is denied by Barry. The evidence of Bianco was shown to be untrue by the cross-examination and exhibits.

The story of Karatz' connection with the transactions is as follows:

Karatz testified that he had lived in Chicago since January, 1925; that he was 45 years of age and that prior to living in Chicago he lived in Minneapolis for 35 years where he was admitted to the bar and practiced law there; that he came to Chicago to go into business; that after two years he went into the insurance business working for various concerns; that he never practiced law in Illinois.

Karatz continuing stated that he had some dealings with Baiata for a matter of a few weeks; that he had not seen Baiata for about a year prior to that time; that Baiata and he discussed the matter of a tavern at 112 West Madison street; that Baiata told him of some difficulties he was having with the barber shop at 112 West Madison street; that Baiata told him he was thinking of converting the barber shop at 112 West Madison street into a restaurant or a tavern; that he told Baiata he thought the plan was a good one; that shortly after a corporation was formed; that he did not recall how much he, Karatz, had to do with that

corporation, but that he knew he was a party to it; that he thought he was one of the incorporators; that he had nothing to do with People's Exhibit 3, the articles of incorporation of Dave Barry, Inc.; that he received no compensation for his services; that from time to time he received some financial help from Baiata; that he was in very dire circumstances and when he needed money badly Baiata would let him have it; that he helped around the restaurant when it was first opened; that at that time he knew something about Baiata's business record in a general way; that Baiata had told him that at one time he had control of the Niagara Life Insurance Company of Buffalo, N. Y.; that Baiata introduced him to Dave Barry; that Baiata asked him what he thought of Barry coming into the place to give the place tone, front; that the place had been losing money and that he told Baiata that he knew Dave Barry by reputation and he thought it would be an excellent thing for the place; that the following morning he met Barry for the first time; that Baiata, Barry and himself were then present and they talked about Barry coming into the place which resulted in the making of a contract; that he had nothing to do with the Dave Barry, Inc. and did not know when it was formed; that he had his meals there but did not pay for them.

Further testifying Karatz stated that he never made any individual investments in any of the three corporations; that Joseph Baiata arranged for the finances of every one of those corporations; that Barry did not contribute any money to any one of these corporations; that he, Karatz, had never met Otto Van Derck up to this day; that he had seen Van Derck come in and go out of the tavern but that he had never spoken to him; that he never talked with Van Derck with reference to pulling checks while he was with the Amalgamated Bank; that he never received any checks from Van

Derck nor any cash, nor the equivalent of cash; that he never said to Van Derck, "I need some expense money to go to Indianapolis on a deal there"; that he never said to Van Derck that he was about to organize or purchase the Abraham Lincoln Life Insurance Company, nor that he should pull a check or two; that he never heard of such a scheme by him or anyone else; that at no time prior to the indictment did he know that Van Derck pulled any checks at the Amalgamated Bank for anyone's benefit; that he first met Fortier on July 4, 1934.

Further testifying Karatz stated that a contract was entered into a week or ten days before the Hall of Champions was opened. The contract was between the Personal Exhibitors and the Dave Barry Amusement Corporation and that he devoted all his time in getting the place ready; that he received in all through his association with Baiata, in the tavern and these other enterprises, approximately $2,000, from August, 1933, to the present time; that he received $300 on account of the Barry Enterprises; that the Terminal National Bank was a depository of the moneys received from Old Heidelberg belonging to the corporation; that it was moneys received from the amusement out at the Fair.

Further testifying Karatz stated that he received no money from Baiata or any other person, knowing that its source was a defalcation of Van Derck while employed in the Amalgamated Trust and Savings Bank; that he came into the tavern about a week prior to the Baer-Carnera fight; that Baiata told him about the Dave Barry special to the fight; that two men had come in and talked Dave Barry and Baiata into running the fight special; that he had nothing to do with the disbursement of the funds in reference to that trip; that he received $15 or $20 for his efforts.

Further testifying Karatz stated that he met Fortier on July 4, 1934, at the Fair grounds; that before that time he had never seen him to his knowledge; that Baiata introduced Fortier to him as Arthur Fay; that when they opened the Garden of Champions, Fortier worked for them and Baiata paid him $18 a week; that the first day Fortier worked all day and all evening; that he knew at that time that Fortier was also employed at the Amalgamated Bank; that Fortier was with them until the day before Labor Day; that Fortier said he was going on his vacation and that he never worked for them after that time; that he did not know when he, Fortier, returned to the bank; that the final payment on the purchase of the Abraham Lincoln Life stock was made on Saturday, September 9, 1934, in the sum of $10,000 in Springfield; that he got back Sunday morning; that the following morning or the day after, he went to the tavern and saw Baiata who was sitting talking with Arthur Fortier; that Baiata said, "Karatz, here is Art. I have just been telling him about the insurance company deal"; that he, Karatz, said to Baiata, "What insurance company deal?" and that Baiata then started to "hem and haw" and said "There is not anything to talk about. What do you mean, talking to him or anybody else about any insurance deal?" Karatz continuing to testify, stated that he then turned to Fortier and said, "Art, when the time is ripe, when there is anything to talk about, I will get in touch with you." This was in reference to a position at the insurance company. Fortier was still employed by the bank. Karatz further stated that he saw Fortier "after that when he came back from the second payment"; that a second payment of $15,000 had been made on October 8, 1934; that the next time he saw Fortier was Columbus Day; that he called on the telephone at his home; that he told Fortier that he wanted to talk with him but that Fortier said he was not coming down town that day; that he had made

other arrangements as it was a legal holiday; that he asked Fortier when he could see him and that Fortier said, "Tomorrow at any time"; that he asked Fortier what time he went to work and he answered, "Nine o'clock in the morning"; that he arranged to meet Fortier at a quarter to nine in front of the Atlantic Hotel the next morning; that Fortier did not meet him there and after waiting five or six minutes he called the bank and asked for Mr. Fortier, but that the operator said he was in the bank but not available at the moment; that he telephoned later and got Fortier on the 'phone and that he came over to the lobby; that the reason for this meeting was that he wanted to find out something about a particular security. (Opposed to this testimony relative to Fortier's leaving the bank on different occasions was the testimony of Van Derck when he testified that Baiata promised to arrange to have Karatz call Fortier out of the bank in the morning so that he could pull the checks.)

Karatz continuing testified that the general nature of the talks was in reference to the employment of Fortier by the Lincoln Life Insurance Company; that he never discussed compensation for this proposed job with the Abraham Lincoln Life Insurance Company other than to tell Fortier that his salary would have to be nominal to start with; that he did not arrange or discuss a salary of $5,000 a year; that People's Exhibit 36 is a memorandum he made at the time he talked with Fortier; that after he made that memorandum he put it in his pocket; that he did not have the memorandum in his possession at the time of the trial and that he did not know how the State's attorney obtained it; that he did not remember seeing Ann White before in his life; that he was never in that bank in the company of Joseph Baiata or anyone else.

(Ann White, a witness on behalf of the People, testified that she was a bookkeeper for the bank of Montreal; that she knew Abraham Karatz and Joseph

Baiata; that in the early or middle part of November, 1934, she saw Mr. Karatz and Mr. Baiata in the Bank of Montreal; that she had a conversation with Mr. Baiata; that Mr. Karatz was standing back of him and that he came into the bank to cash a check; that she initialed the check for him and spoke to him about his account running low; that Baiata said he had some bonds and wanted to know if the bank bought them; that she told them they did and that Baiata said he was going to sell the bonds and increase his account; that he had a large check for $25,000 drawn on an out-of-town bank which he wanted to cash; that she had no conversation with reference to the check for $25,000; that she did not handle it as it was too big for her; that the reason she remembers this was because of the size of the check and that he did not have sufficient funds in his account to take care of it; that she had seen Mr. Karatz before the morning just referred to; that he had been in the bank with Baiata before.)

Karatz continuing testified that he never heard any conversation Baiata had with Van Derck where he was referred to as an attorney; that he never took part in any conversation with Van Derck where he said something about buying an insurance company, or buying a bank or any other deal.

Further testifying Karatz stated that he had known the defendant Gustaf Linquist 20 years; that he met him at St. Paul, Minnesota; that he had a number of positions; that he had a talk with Baiata with reference to the organization of the Franklin Life Insurance Company in the early part of September, 1934, or the latter part of August; that about September 22 or 23, 1934, Baiata came out of the Fair grounds and Baiata said to him, "Forget all about the Franklin deal . . . I have got a company that can be had for $50,000 . . . the Abraham Lincoln Life Insurance Company"; that he told Baiata that he thought it was a very fine

institution and that as far as he knew it had always enjoyed a very fine reputation; that he knew something about the men who were at the head of it; that Baiata said control of that company can be had for $50,000; that if I would go with him he would take me to the man who can deliver it, a man by the name of Bob Telfer; that he told Baiata he would have to talk with Bob Telfer himself; that the following morning they went to see Telfer; that he asked Telfer who told him that the stock of that company could be had for $50,000 and asked him whether he had been in touch with the officers of the insurance company and he said he had, but they were not the ones with whom he had been talking about the purchase of the stock; that he asked Telfer who it was, and he said Mr. Doyle of Springfield; that he asked him if ''Tip'' Doyle told him the stock could be purchased for $50,000 and that he replied that it could be purchased around that figure; that Telfer called Mr. Doyle by long distance in their presence and talked with him; that Karatz and Baiata left for Springfield that day; that thereafter Baiata, Karatz and Linquist negotiated for the purchase of the insurance company, paying therefor upwards of $50,000.

On cross-examination Karatz stated that he thought Baiata was a very good friend of his and that Baiata had befriended him when he was in dire need; that he joined with Baiata in the enterprises; that Van Derck was not in the enterprises. When asked what was the name of ''the big man, or fellow from Savannah, or Detroit,'' or whoever was putting up the half million dollars for Baiata, he could not give the name.

Continuing Karatz testified that Linquist had no more financial interest that he had; that Baiata, Linquist and he had a contract to divide the stock among the three of them; that Linquist did not put up any money; that he did not talk with Art Fortier over the

bar of the Atlantic Hotel; that he thought while he was in Chicago he made one deposit in the Terminal Bank of checks drawn on the Amalgamated Bank on the Dave Barry, Inc. account; that he did not know about the pulling of any checks; that he did not know that the $25,000 came from Baiata's connection with this man down in Savannah; that he did know that $8,000 of it was drawn from the Terminal National Bank; that he drew it; that he "did not know until that day that the Dave Barry Enterprises didn't ever have that kind of money"; that he did not pay any attention to the condition of the company's finances; that he was signing checks on that account but did not know exactly what was in that bank; that he never discussed with the president what was in the bank account; that he never signed a check except at Baiata's request, except on one occasion, and that he assumed that when Baiata asked him to sign a check there were funds in the bank.

Karatz further testifying stated that he talked with Fortier three or four times with reference to getting information from him for the job at the Abraham Lincoln Life; that it did not take three or four visits to find out his name and address; that he saw him several times but that Fortier was undecided as to whether or not he wanted to make the change. This in substance was the evidence relating to Karatz.

We have set forth the evidence in this case quite extensively as we deemed it necessary in order to show the relationship which existed between the parties involved. The relationship of the parties is always very important when considering charges of conspiracy.

In addition to Barry's denying any knowledge of or participation in any of the acts which the State has alleged was a part of the conspiracy, a motion was made on July 10, 1935, to vacate the sentence imposed on June 28, 1935, and asking that a new trial be granted

in accordance with the prayer of the petition and the affidavits thereto attached.

In Barry's petition for a new trial, which is supported by affidavits, Barry sets forth the facts of newly discovered evidence in support of his motion, but in view of the conclusion we have reached in this case, it will not be necessary to pass upon them.

In his testimony Barry denies that the checks were made out in his handwriting and testified further that the handwriting on the checks, which Bianco said was in Barry's handwriting, was in the handwriting of Joseph Baiata. Barry further stated that he first heard about the trouble when a reporter for one of the daily newspapers came to his house and showed him an article that the State's attorney was looking for him and that was the first he heard of it; that he came downtown and went into the State's attorney's office and talked with Mr. Vernon Thompson. In giving his testimony Barry was not permitted to state what he said to Thompson because of objections by the State. He again stated that he made a statement to Mr. Thompson telling him what he knew about everything and denied that he knew Van Derck, excepting to know him only as "Van."

Testifying further Barry stated that the signatures on the checks were put on them at the request of Joseph Baiata and that the amounts were not fixed or written in the body of the checks at the time they were signed and that none of the checks, in so far as the amounts are concerned, were written in his handwriting; that Karatz could indorse a check and deposit it there as secretary, and Baiata could as an officer, and that he, Barry, could as president; that Baiata's handwriting appears on the indorsement of People's Exhibits 81 and 82. (Said exhibits being two checks on the Amalgamated Trust & Savings Bank, payable to the order of Dave Barry Enterprises, Inc., for the sum

of $5,000 each, indorsed by the corporate name by Joseph Baiata, treasurer.)

The evidence shows that Barry was hired by Baiata as manager of Baiata's restaurant at $50 a week and that, although in the reincorporation of the business as the Dave Barry, Inc., of which Barry was nominally the president, Barry received no stock and was still an employee, being only manager of the restaurant.

The testimony of both the witnesses for the State and for the defense shows that Barry's hours of service at the restaurant were from 12 o'clock at noon until 2 a. m. or 3 a. m. the following morning; that Baiata arranged at the bank for two signatures to the checks; that of his own and that of Barry; that the purchase of supplies for the restaurant were made in the mornings and both the State's witnesses and those for the defense testified that almost every night Baiata had a standing order that the check book be presented to Barry and that he was to sign the checks in blank. In doing this Barry apparently had not the slightest suspicion that he was being used for the purpose of perpetrating a fraud on the bank. The evidence further shows that Barry had nothing to do with the bank deposits and that whatever was done was carried out at the direction of his employer Joseph Baiata. No evidence was introduced to show that Barry knew or associated with Ehlers, Sanders or Linquist, or that Barry knew of the many aliases used by Baiata, or that he knowingly participated in obtaining money from anyone, or that he shared in the money in any way, or that he ever heard of the Abraham Lincoln Life Insurance Company or was to profit by its purchase.

It is the contention of the State that when Barry conducted his prize fight special train to New York, the checks that were used and which had been countersigned by Baiata under the name of Bianco were given

to Barry and were knowingly used by Barry to draw money from the Amalgamated Trust and Savings Bank. There was introduced in evidence by Barry his books of account, showing the amounts of money he had received not only from Baiata but also from the sale of tickets for the fight and detailing each item of expense for which this money was paid out, such as newspaper advertisements, postage, telegrams, etc., and the name of each person with whom the money was spent. There is no contention made that this account is not correct and we think it effectually corroborates Barry's claim that he was not engaged in a conspiracy to defraud the bank. In addition to this the account of Dave Barry, Inc., at the bank on which the checks were drawn, for the week of June 9 to June 16, inclusive, had a daily balance of from $468.39 to $834.58, and as the checks drawn totaled $350, there was ample cash in the bank to pay them and hence such act on the part of Barry was not illegal and could not be considered as a part of a conspiracy to obtain money illegally from the bank.

The oral evidence which tends to connect Barry with the conspiracy was that of Otto Van Derck, the clerk of the bank, and whilst on the record Van Derck had pleaded not guilty, yet he had confessed as to his participation in the fraud and was used as a witness for the State. Van Derck stated at one place in his testimony (Abst. p. 80) ''I didn't have to ask Barry why he was signing those checks. I knew. I entered into quite a few conversations with him concerning these checks I had pulled.'' On page 86 of the abstract the same witness stated: ''I never talked with Barry about his relations to Baiata. Baiata arranged for most of the withdrawals. Barry was *not* in the conversations when I was told to pull a check. I don't remember whether he would ask me or Joe would ask me on some occasions.'' The testimony of this wit-

ness against Barry, in addition to being that of an accomplice, is contradictory and indefinite.

The witness Van Derck, as shown by the evidence, sought out Baiata by going to his restaurant and was apparently quite willing to betray his employers and get from Baiata in exchange for his perfidy, such gratuities as meals, hair cuts and suits of clothes.

Aside from the scant testimony that was produced against Barry, it becomes necessary to consider the points that were raised as to the claim of prejudicial error that was committed by the State. As was said in the case of *People v. Lawson,* 345 Ill. 428, the Supreme Court, speaking through the late Mr. Justice DeYoung, said:

"The testimony of an accomplice is subject to grave suspicion, should be acted upon with great caution, and the jury should carefully consider such testimony in the light of all the other evidence in the case and the influence under which the testimony is given, in order to determine whether the purpose of the witness is to shield himself from punishment, to obtain some personal benefit or advantage or to gratify malice; . . .

"If, after all the facts and circumstances in evidence are considered, the uncorroborated testimony of an accomplice is of such a character as to prove guilt beyond a reasonable doubt it will authorize a verdict of guilty, but a conviction on such testimony will not be sustained unless the record is substantially free from prejudicial error."

Van Derck testified that six months prior to his testimony he had been in charge of the State's attorney; that he had furnished a bond signed by a policeman in the State's attorney's office; that he was not at liberty nor was he in jail; that he was on the fifth floor of the jail, but was permitted to go out to various places about the city, but that he was not in the regular jail but in a part of the building set aside for witnesses;

that he hoped to get probation, although he had no promises; that he rather considered himself in charge of the State's attorney's office.

In his closing argument, the assistant State's attorney had the following to say about Barry:

"And, gentlemen, I ask you if his acts were those of an innocent man. I will leave it to any one of you, if you read in the paper that the State's attorney wanted you in connection with a bank matter, and if you were perfectly innocent in the matter, wouldn't you come over here right away, or would you run down and get a criminal lawyer first, like he did, Mr. W. W. Smith, before you had a talk with Mr. Thompson. And Mr. Thompson isn't such a vicious fellow. We don't beat them; we don't mistreat them. We did not mistreat the boy, we did not mistreat Karatz, and we did not mistreat Barry."

Counsel for Barry thereupon objected.

"The Court: He is arguing the inferences from the evidence, or the lack of evidence, on the subject."

The assistant State's attorney, continuing:

"There was no reason at all for Barry to get himself a criminal lawyer if he was innocent before he talked to Mr. Thompson; no reason at all. But he wanted to be sure he had his story, and he came in, like the Judas that he is and like he was on that stand, and said, 'I don't know the boy, and I never talked to him.' "

There was no pertinent evidence in the record upon which to base this statement and it has not yet been decided in this or any other jurisdiction that the retaining of counsel by one accused of crime is evidence of guilt.

When the evidence upon which the prosecution relies is the testimony of an accomplice, the record should be substantially free from error. The manifest efforts of prosecuting counsel to introduce into the

case matters wholly foreign and irrelevant, the sole effect of which was to prejudice the jury against the defendant, was error. The meager and conflicting evidence introduced against Barry was in other respects further rendered valueless by the prejudicial error of the State. *People v. Gordon,* 344 Ill. 422.

. We think the evidence in this case shows that Baiata, the confessed swindler, saw an opportunity to get Barry, a man whom the presumptive and other evidence tended to show was a man of good reputation for honesty and straight dealing, associated with him not only to attract business to his restaurant by Barry's popularity, but in order that such a name would aid him in fleecing his victims. Whilst the signing of checks by Barry in blank, at the instance of Baiata, was not in accord with good business practice, yet it must be remembered that Barry was an employee, working for Baiata. The necessity for the use of the checks for legitimate purposes was apparent and these checks were, in the main, used for such legitimate purposes, and the evidence does not show that Barry had any knowledge of the wrongful purpose for which some of them were used by Baiata.

We do not believe the evidence against Barry was sufficient to prove beyond a reasonable doubt that he knowingly entered into a conspiracy to defraud. The evidence further tends to show that Barry knew nothing about the operations of Baiata, wherein the latter obtained large sums of money and which the evidence shows he placed in other banks to his own credit and that Barry received no part of it; that by relying upon the honesty of Baiata to only use the checks which he countersigned for a legitimate purpose for the expenses of the restaurant, Barry was made the innocent victim of Baiata for the purposes of fraud. We cannot find that he, in any way knowingly participated in the conspiracy and the evidence of the State fails to

prove him guilty beyond a reasonable doubt. With Karatz, the situation was somewhat different. He had known Baiata for a period of five years and was associated with him in several business affairs and knew Baiata's financial condition. Karatz was instrumental in having Fortier leave the bank so that the checks could be "pulled." He accompanied Baiata to the Bank of Montreal when the attempt was made to obtain $25,000 by having one of the checks O. K.'d there and he also accompanied Baiata to Springfield where the money was paid for the purchase of the Abraham Lincoln Life Insurance Company; that he assured Van Derck the insurance deal was a sure thing when the latter furnished the expense money to go to Springfield. He also obtained the $8,000 draft for Linquist. He also was with Baiata at various times in the Brevoort Hotel where Baiata was registered under the name of Farquhar and at Springfield when carrying on the deal for the purchase of the insurance company, and where he, Karatz registered under the assumed name of Kahn. He cannot say that in view of the evidence against Karatz the prejudicial remarks of the State's attorney would be equally applicable, as they were not objected to by Karatz and as the court said in *People v. Stathas,* 356 Ill. 313:

"Happenings in the trial court, such as alleged misconduct of the State's attorney, should be objected to on the trial in order to be properly presented for review in the Supreme Court."

We cannot say after reviewing the entire record, that the jury was not justified in finding beyond a reasonable doubt that Karatz is guilty.

Therefore, for the reasons herein set forth, the judgment of the criminal court as to the defendant Barry should be and the same hereby is reversed and the cause is remanded to the criminal court for a new trial, and, as to the defendant Karatz, the judgment of the

criminal court should be and the same hereby is affirmed.

*Judgment reversed and cause remanded as to the defendant Dave Barry; judgment affirmed as to the defendant Abraham Karatz.*

HALL, P. J., and HEBEL, J., concur.